

**NUMBER 13-14-00045-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

GUSTAVO ARMANDO GARZA,                                        Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

### On appeal from the 54th District Court of McLennan County, Texas.

# MEMORANDUM OPINION

### Before Justices Garza, Benavides and Perkes
### Memorandum Opinion by Justice Garza

Appellant, Gustavo Armando Garza Jr., was convicted of possession of 2,000 pounds or less but more than 50 pounds of marihuana, a second-degree felony, and was sentenced to ten years' imprisonment.  *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121

(West, Westlaw through 2013 3d C.S.). Garza raises four issues on appeal. We affirm.[1]

## I. BACKGROUND

Ryan Wadkins, a Texas Department of Public Safety ("DPS") trooper, testified that he was patrolling Interstate 35 on May 17, 2012 in Lorena, Texas, when he observed a pickup truck pulling an aluminum trailer "ma[k]e a drastic reduction in speed." Wadkins stated that this "seemed very unusual because I did not believe that he was speeding based on my visual observations." Wadkins stated that the driver did not merely do a normal "brake check"; rather, it was "a substantial reduction of speed enough to where traffic behind him was having to lock up their brakes, pass, change lanes to go around him because of his reduced speed." Wadkins followed the vehicle and performed a "routine registration check" which revealed that the truck and the trailer were both recently registered to different persons. Wadkins then observed the vehicle change lanes without signaling, and so he initiated a traffic stop.[2]

The driver pulled over to the shoulder but left his turn signal on, which Wadkins found unusual and a "possible sign of nervousness." When Wadkins approached the vehicle, he "noticed that the driver appeared very nervous." The driver "was sort of searching throughout his vehicle trying to locate the documents" and "was unable [to] lower the windows. They were obviously powered windows, but he couldn't find the right switch." Wadkins eventually opened the door to make contact with the driver. When Wadkins asked the driver for his license and insurance, he was "taken aback" by the

---

[1] This appeal was transferred from the Tenth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

[2] A video recording of the traffic stop was admitted into evidence and played for the jury.

2

cleanliness of the glove compartment, which contained only an owner's manual, registration receipt and proof of insurance, considering that the vehicle was "several years old."

The driver identified himself as appellant Garza. Wadkins stated that Garza was "still extremely nervous"—"he was visibly shaking throughout his body" and "his hand was trembling" as Garza handed over his license. It seemed unusual to Wadkins that Garza was acting that way given that he was only being pulled over for failing to signal a lane change.

The trailer contained three live horses. Garza explained to Wadkins that he started his trip in Laredo, picked up the horses in Devine, in Medina County, and was heading to Italy, in Ellis County. Wadkins testified that Garza "didn't seem to exactly know what he was doing. He didn't seem to exactly know where he was going. His details were very sketchy at best. I noticed that even while—our only few sentences, his stories would change and the facts weren't the same." Garza told Wadkins that the truck was registered in the name of his friend, Jose, but Garza was unable to provide Jose's last name.[3] Wadkins told Garza that he would issue a warning, not a ticket, "to try and relieve some of his anxiety." The conversation continued but "still, the details were sketchy and inconsistent."

Garza explained that he had purchased the horses and was now trying to sell them. Garza told Wadkins that the horses were "barrel racing horses" and that he hoped to sell each one for $9,000 or $10,000. He was not clear as to whether he was selling the horses for himself or for a third party. Garza said he paid $4,000 for the pickup truck; Wadkins

---

[3] Wadkins testified that the truck was registered to Jose Angel Martinez.

3

testified that his registration check revealed that the truck had actually been sold for $6,000. Wadkins stated: "It didn't seem right that he was withholding common information. It didn't seem right that he wasn't willing to cooperate with me, trying to determine the ownership of these horses and ownership of his vehicle. It didn't seem like he wanted to divulge the location which he was traveling to."

Wadkins stated that he had a "basic knowledge" of horses by virtue of having grown up on a ranch. When the prosecutor asked whether the horses appeared to be worth $10,000, Wadkins replied:

> Just based on my previous experience on farms and ranches and based on all the livestock shows I attended and the rodeos that I have seen, it was apparent these animals were malnourished in my opinion. They seemed very aged. You could count most of their ribs on these animals. Their hip bones were protruding. They were in—I would consider very poor shape.

Garza consented to a search of the trailer. Another DPS trooper, who had stopped to give assistance, searched the trailer while Wadkins stayed with Garza. After more than 27 minutes of searching, the trooper found fifteen cellophane-wrapped bundles of a green plant matter under some bales of hay in a padlocked compartment in the "nose" of the trailer.[4] The bundles were later confirmed to contain 674 pounds of marihuana.[5] Wadkins then arrested Garza at gunpoint. A search of the pickup truck revealed a key to the padlock securing the compartment where the contraband was found. The key was attached to the truck's ignition key.

On cross-examination, Wadkins conceded that he could not say whether the

---

[4] Wadkins stated that, by reaching through slats, the other trooper was able to search the compartment without unlocking the padlock.

[5] Wadkins later testified that the retail value of that quantity of marihuana is approximately $370,000.

horses were actually used for barrel racing. He stated that it was possible for someone to have loaded the horses onto the trailer without ever going into the compartment where the marihuana was found. Wadkins agreed with defense counsel that, given the substantial quantity of contraband, it was unlikely that Garza was "running this operation by himself." He disagreed, however, that it was possible for anyone to be in possession of that much contraband without being aware of it. He conceded that there were no weapons found in the truck or trailer, and that he did not investigate where the second cell phone was purchased. Wadkins did not recall that Garza's license was suspended at the time the arrest was made; he acknowledged that being pulled over by an officer while having a suspended license would possibly make someone nervous. Wadkins also acknowledged that, if Garza had loaded the trailer, he would have had physical contact with the hay and the marihuana, and yet Garza's clothes did not smell of hay or marihuana.

Defense counsel offered into evidence several photographs of the two DPS troopers posing in front of the confiscated marihuana bundles. The officers appeared to be sitting on top of two children's saddles that were found in the trailer. Wadkins admitted on re-direct examination that he thought the photographs were "funny" and that he was "excited" because he "just made a big bust." Wadkins explained, "This is our celebratory trophy shot." When asked if it was "a little bit embarrassing" that the photos were being shown in court, Wadkins replied: "I'm proud of my job. I love what I do. That's a good day at the office."[6]

Donna Kennedy, a DPS investigator, testified that she followed up on the case by

---

[6] At the time of trial, Wadkins had been employed by DPS for three years.

calling the number of the person whom Garza was supposed to meet in Italy. According to Kennedy, Garza had told Wadkins that, when Garza got to Italy, he was supposed to call a phone number that was on a bale of hay on the side of the road. Kennedy contacted a local DPS trooper and obtained the number. She called the number and a man named "Joshua Trees" answered. Trees stated that he was in the construction business; he denied that he was interested in purchasing horses. A criminal background check revealed that Trees "owned a lot of heavy equipment which would be associated with heavy construction." Kennedy further testified that, according to her investigation, Garza had driven the truck involved in this case through "a L[a]redo check point" on four separate occasions in 2012.

Jack Campbell, a McLennan County sheriff's deputy, testified that Garza failed to appear at an October 21, 2013 court setting. According to Campbell, the trial court ordered Garza's bond forfeited and issued a capias warrant. Garza appeared voluntarily two days after the trial setting.

Montea Stewart, a private investigator, testified on Garza's behalf. She stated that she was appointed by the trial court, at defense counsel's request, to be an investigator in this case. Stewart testified that the State obtained a default judgment against the registered owners of the pickup truck and trailer in a forfeiture suit. A copy of the final judgment of forfeiture was entered into evidence. Stewart further testified that, according to her investigation, Joshua Trees owns a business called Rowdy T Ranch whose business purpose is officially listed as "general ranching and livestock." She agreed that it would be false to say that Trees "has no connection with livestock animals or anything like that." Stewart further testified that the phone number which appeared on the side of

6

the bale of hay in Italy, and to which Trees answered, was previously used by a man named Ephraim Vasquez from August 4, 2006 to May 28, 2012.

Garza was convicted as charged and this appeal followed.

## II. DISCUSSION

## A. Improper Argument

By his first issue, Garza contends that the prosecutor impermissibly commented on his decision to plead not guilty and his decision not to testify, thereby depriving him of a fair trial. The comment about which Garza complains, which was made during opening argument at the punishment phase, is as follows:

> Ladies and Gentlemen of the Jury, you-all are charged with sentencing Gustavo Garza. He's sitting right here. And I want you to keep in mind, this isn't someone who came into this courtroom and took responsibility for what they did. This is somebody who came in here, pled not guilty, and told you a story.

The following exchange then occurred:

[Defense counsel]: Excuse me, Your Honor, I would object on two grounds, he just testified—or he's just implying that . . . my client has failed to testify. Um, he has stated that he's told a story. My client has obviously not testified.

Secondly, he's opining on his decision to have a trial which is a constitutional right that he has and that's improper.

THE COURT: I'll overrule the objection.

I will instruct the jury, our law provides that a defendant may testify in his own behalf, if he elects to do so. In the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case the Defendant has elected not to testify and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any

7

> purpose whatsoever as a circumstance against the Defendant.

The trial court then denied defense counsel's requests for an instruction to disregard the prosecutor's comment and for a mistrial.

Permissible jury argument falls into four distinct and limited categories: (1) summary of the evidence; (2) reasonable deductions from the evidence; (3) response to opposing counsel's argument; or (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). We examine alleged improper argument in light of the facts adduced at trial and in the context of the entire argument. *McGee v. State*, 114 S.W.2d 229, 239 (Tex. Crim. App. 1989). A trial court's ruling on an objection to improper jury argument is reviewed for abuse of discretion. *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004). We also review a trial court's denial of a mistrial for abuse of discretion. *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011). In determining whether the trial court abused its discretion in denying a mistrial, we consider (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Id.*

A comment on a defendant's failure to testify violates both the state and federal constitutions as well as Texas statutory law. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011) (citing U.S. CONST. amend. V; *Griffin v. California*, 380 U.S. 609, 615 (1965); TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 38.08 (West, Westlaw through 2013 3d C.S.)). In assessing whether an argument violates the defendant's constitutional rights in this manner, we "view the argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible argument." *Id.* If the argument "might reasonably be construed as merely an implied or

8

indirect allusion" to the defendant's failure to testify, there is no violation; instead, "the implication that the State referred to the defendant's failure to testify must be a clear and necessary one" if it is to constitute error. *Id.* "The test, then, is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Id.* In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character. *Id.*

Garza argues that the trial court erred by overruling his objection and denying his requests for an instruction to disregard and for a mistrial. The State argues the trial court did not err because "[o]n its face, the comment does not address a failure to testify." Instead, the State argues that the prosecutor's comment merely referred to the "story" "told" by Garza that he was unaware of the marihuana in the trailer—i.e., Garza's principal defensive theory.

In *Randolph v. State*, the Texas Court of Criminal Appeals considered whether a comment by the prosecutor at the punishment phase that the defendant "refused to take responsibility for his actions" was proper where the defendant had previously testified at the guilt-innocence phase but declined to testify at the punishment phase. *Id.* at 890. The Court observed:

> Prosecutors often argue at the punishment phase of trial that a defendant is not deserving of leniency or a probated sentence because he has not taken responsibility for his actions, shown remorse, or both. In a case in which the defendant does not testify either type of statement could constitute an impermissible comment on the failure to testify.
>
> . . . .
>
> [A] defendant may expressly deny responsibility by putting on an alibi defense or asserting that the result was an accident. Thus, the prosecution may fairly argue, during the guilt or punishment stage, that the defendant

9

denied responsibility because he testified to an alibi or he claimed that the deceased died as the result of an accident. *Simply pleading not guilty and demanding that the State prove its case neither accepts nor denies responsibility. Thus, the State could not argue, at either the guilt or punishment stage, that the defendant denied responsibility for the crime simply because he pled not guilty. That would be an impermissible comment on the failure to testify.*

. . . .

On the other hand, comments about the failure to testify are permissible if they are a "fair response" to the defendant's claims or assertions. In *United States v. Robinson*, [485 U.S. 25, 34 (1988)] the Supreme Court approved the prosecutor's argument—"[the defendant] could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain"—because it was in response to the defense closing argument that the government had not allowed the defendant to tell his side of the story.

*Randolph*, 353 S.W.3d at 891–93 (emphasis added and footnotes omitted). The Court went on to hold that the trial court did not err in denying the appellant's objection to the prosecutor's comment because the comment was a fair summary of the defendant's guilt-innocence testimony, in which he testified to an alibi defense. *Id.* at 895 (noting that "the prosecutor may comment upon the testimony actually given during the guilt stage and that is not construed as a comment on the defendant's choice to remain silent during the punishment stage").

Here, Garza elected not to testify at either phase of trial. Moreover, he did not argue, explicitly or implicitly, that he had not been allowed to tell his side of the story. Accordingly, the prosecutor's comment cannot be considered a "fair response" to any claims or assertions made by the defense. *Cf. id.*; *Robinson*, 485 U.S. at 32 ("[W]here as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege."). The comment, instead, more closely resembles the type of remark which

10

the *Randolph* Court set forth as a hypothetical example of an improper comment on the defendant's right not to testify. *See* 353 S.W.3d at 893.

Assuming, without deciding, that the trial court erred in denying Garza's objection and request for an instruction to disregard, we proceed to consider whether the presumed error would require reversal. *See* TEX. R. APP. P. 44.2. "When a prosecutorial remark impinges upon an appellant's privilege against self-incrimination under the constitution of Texas or of the United States, it is error of constitutional magnitude." *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011). Constitutional error is reversible "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). In making this determination, we consider, among other things, "the nature of the error (e.g., erroneous admission or exclusion of evidence, objectionable jury argument, etc.), whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations . . . ." *Snowden*, 353 S.W.3d at 822.

Garza contends that the trial court's ruling "communicated to the jury that considering [his] decision not to testify and take responsibility were permissible areas of consideration for them" and that "the only remaining possibility of salvaging this error in the face of the trial court's ruling would have been to grant [his] request for mistrial."

We disagree. Although the trial court refused Garza's request to instruct the jury to disregard the comment, it did immediately instruct the jury that it must not take Garza's decision not to testify as a circumstance against him in its deliberations. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) ("Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial. And we generally

11

presume that a jury will follow the judge's instructions." (Footnotes omitted)).[7] The jury was also so instructed in the punishment charge. Additionally, the prosecutor did not refer to or emphasize the improper comment at any other point during the punishment phase. Finally, we note that the prison term assessed by the jury was substantially shorter than the maximum 20-year prison term requested by the State, and is instead closer to the minimum punishment for a second-degree felony. *See* TEX. PENAL CODE ANN. § 12.35(a) (West, Westlaw through 2013 3d C.S.) (providing that a second-degree felony is punishable by two to twenty years' imprisonment). For these reasons, we find beyond a reasonable doubt that any error did not contribute to the jury's punishment determination. *See* TEX. R. APP. P. 44.2(a). For the same reasons, we conclude that the trial court did not abuse its discretion in denying Garza's motion for mistrial. *See Archie*, 340 S.W.3d at 738.

Garza's first issue is overruled.

## B.     Evidentiary Rulings

By his remaining issues, Garza challenges evidentiary rulings made by the trial court. We review such rulings for abuse of discretion. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). In conducting our review, we view the record in the light

---

[7] Garza cites case law stating that "the adverse effect of any reference to the accused's failure to testify is not generally cured by an instruction to the jury." *Johnson v. State*, 611 S.W.2d 649, 650 (Tex. Crim. App. 1981); *Overstreet v. State*, 470 S.W.2d 653, 655 (Tex. Crim. App. 1971). However, in *Waldo v. State*, the court of criminal appeals observed that

> the . . . presumption that an instruction generally will not cure comment on failure of the accused to testify . . . has been eroded to the point that it applies only to the most blatant examples. Otherwise, the Court has tended to find the instruction to have force.

746 S.W.2d 750, 754 (Tex. Crim. App. 1988); *accord Moore v. State*, 999 S.W.2d 385, 406 (Tex. Crim. App. 1999); *Dinkins v. State*, 894 S.W.2d 330, 359 (Tex. Crim. App. 1995); *Williams v. State*, 417 S.W.3d 162, 176 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). The comment at issue here was not so "blatant" such that the trial court's instruction would be ineffective to cure any harm.

most favorable to the trial court's conclusion and reverse only if that conclusion is outside the zone of reasonable disagreement. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

### 1. Wadkins and Edwards

By his second issue, Garza contests the admission of testimony by Wadkins and Ronnie Edwards, a veterinarian, regarding the condition of the horses. He contends that it was error to allow those witnesses to testify as experts because they were not disclosed as experts twenty days in advance of trial as required by a discovery order previously rendered by the trial court. He argues that the trial court should have excluded the testimony or granted either a *Daubert*/*Kelly* hearing[8] or voir dire examination "before allowing these witnesses to testify in an expert capacity."

We disagree that the trial court erred. Under Texas Rule of Evidence 701, a lay witness may provide opinion testimony that is "(a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." TEX. R. EVID. 701. Here, Edwards testified that, based on blood tests and physical examinations that he administered, he assessed the horses' physical condition on a recognized zero-to-ten scale, with zero being "a horse that died from malnutrition," five being "perfect" and in "[l]ean racing condition," and ten being "one that's died from being too fat." He stated that, of the horses found in Garza's trailer, "one was a five, one was a four, and one was a three." Wadkins opined that the horses were "malnourished" and in "very poor shape." The opinions of both witnesses as to the horses'

---

[8] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

13

condition were rationally based on their perceptions and were helpful to determining a fact at issue—i.e., whether Garza was truthful when he told Wadkins that the horses were to be sold for barrel racing. Accordingly, the testimony was admissible as lay opinion testimony under rule 701, and the trial court did not err in overruling Garza's objection.[9] Garza's second issue is overruled.

### 3. William Lee Carter

By his third issue, Garza contends that the trial court erred by excluding the testimony of William Lee Carter, Ph.D., a psychologist, "regarding [Garza]'s diminished mental capacity." Carter testified before the jury at the guilt-innocence phase that he was appointed by the trial court, at defense counsel's request, to determine whether Garza is competent to stand trial. After a competency exam, tests, and a "pretty extensive clinical interview," Carter determined that Garza is competent to stand trial. Carter stated that he also administered an IQ test called the Wechsler Abbreviated Scale of Intelligence. According to Carter, a score of 85 to 115 is considered the normal range on that test. Garza scored an 86 on the "verbal scale, which takes into account vocabulary and verbal reasoning," and 112 on the "performance scale," which is "non-verbal reasoning." Garza's "full scale IQ score"—i.e., the average of the verbal and performance scales— was 99. Carter stated that, according to the test, Garza "has a good, solid IQ." The State objected to this testimony on relevance grounds and the trial court sustained the objection.

---

[9] On appeal, Garza does not discuss whether Edwards's and Wadkins's testimony actually constituted expert testimony. Instead, he discusses solely whether the State acted "willfully" in failing to timely disclose the identity of the witnesses before trial. *See Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006) ("Evidence willfully withheld from disclosure under a discovery order should be excluded from evidence."). Because the discovery order referenced by Garza did not require any disclosure of lay witnesses, the State did not violate the discovery order.

14

Outside the presence of the jury, Carter proffered additional testimony. He stated that Garza is "depressed" and, as a result, "had some problems with concentration." When asked whether it was significant that Garza had a "wide split" in his scores on the verbal and performance scales of the IQ test, Carter stated:

Uh, it's considered a statistically significant difference, meaning, uh, the likelihood of a broad difference in verbal and nonverbal cognitive function is, you know, in his case, probably less than five percent or even one percent of cases would you see something like that without some kind of explanation for that difference. So you would look for things like learning disabilities or lack of exposure to environmental enrichment or psychological disturbance. And depression is what I diagnosed him as having as possible causal factors for that weak in verbal capacity.

. . . .

[I]f a person is raised in a world that's impoverished in one way or another or in a variety of ways, that's what I'm speaking of when I speak of a lack of enrichment exposure. In his situation, he did grow up, uh, in either a poverty or near poverty level existence to my understanding. He's had some significant life stressors that probably have made him depressed since childhood. He experienced some pretty significant deaths and traumas within his family, even as a young boy.

Carter agreed with defense counsel that Garza "lives [in] an emotional fog." He continued his testimony as follows:

[M]y impression of Mr. Garza is that he tends to just kind of move from one day to the next without a lot of preplanning or thinking. Doesn't mean that he's incapable of planning or thinking but by default he just kind of drifts from one day to the next.

. . . .

He's not a—an assertive man. He keeps to himself. He doesn't talk a whole lot about his personal business to other people. He's not aggressive by nature, although I understand that he has been episodically aggressive in the past, doesn't ask a lot of questions, uh, just simply, you know, lives from day to day. So, yes, he could be taken advantage of by somebody who had a high need for control.

The trial court sustained the State's objection to this testimony.

15

Evidence is relevant, and therefore generally admissible, "if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401, 402.

In support of his argument that this ruling was erroneous, Garza directs us to *Ruffin v. State*, where testimony by the same psychologist was at issue. 270 S.W.3d 586 (Tex. Crim. App. 2008). There, the appellant was charged with aggravated assault after he shot at ten police officers during a "standoff" at his property. *Id.* at 587. At trial, the appellant "contended that he was suffering from severe delusions and believed that he was shooting at Muslims, not police officers." *Id.* Defense counsel proffered testimony by Carter that, on the day of the standoff, the appellant "was suffering from psychotic symptoms such as hearing or seeing things that did not exist," "was not fully aware of the effects his behavior was having on other people," and had a "diminished capacity" to make rational judgments. *Id.* at 590. Carter stated that, because of mental illness and delusions, the appellant did not know that he was shooting at law-enforcement officers. *Id.* The trial court excluded Carter's testimony but the Texas Court of Criminal Appeals reversed, holding that the testimony is "clearly relevant to the issue of whether appellant intended to shoot at police officers during the standoff or whether, because of a mental disease and the delusions that he suffered as a result of that disease, he believed that he was shooting at Muslims or some other figment of his mind." *Id.* at 596. The Court noted that "affirmative defenses, other than insanity, based on mental disease, defect, or abnormality . . . do not exist in Texas." *Id.* at 593 ("Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas."). However, because "mental diseases or defects may affect a person's perception of the

world," evidence of a defendant's "history of mental illness" may be considered to the extent it "directly rebuts the particular *mens rea* necessary for the charged offense." *Id.* at 588, 593, 596.

We find *Ruffin* distinguishable. In that case, Carter would have testified that the appellant suffered from delusions on the day of the alleged crime which caused the appellant to be unaware that he was shooting at police officers. This testimony, if admitted, would have specifically and directly negated the *mens rea* required to convict. *See id.* at 594 (noting that the State had the burden to prove "that the defendant intended to shoot a police officer, not a trespasser or Muslim"). But the *Ruffin* Court acknowledged that expert testimony regarding a defendant's history of mental illness "may . . . be excluded if it does not truly negate the required *mens rea*," and it cited several cases illustrating that point. *Id.* at 596 n.32 (citing *United States v. Brown*, 326 F.3d 1143, 1148 (10th Cir. 2003) (finding trial court properly excluded expert psychiatric testimony that, because of post-traumatic-stress syndrome and chemical dependency, defendant was unable to make "correct choices"; testimony did not rebut *mens rea* in prosecution for conspiracy to possess methamphetamine); *United States v. Cameron*, 907 F.2d 1051, 1067–68 (11th Cir. 1990) (stating "[e]vidence offered as 'psychiatric evidence to negate specific intent' is admissible . . . when such evidence focuses on the defendant's specific state of mind at the time of the charged offense," but holding that defendant failed to demonstrate how her expert's generalized psychiatric testimony would negate intent in drug-trafficking prosecution); *United States v. White*, 766 F.2d 22, 24–25 (1st Cir. 1985) (upholding exclusion of expert psychiatric testimony "to the effect that, because of the influence exerted upon her by her mother, she was unable to resist her mother's request

17

for assistance, and was thus compelled to aid her in her drug dealing" as merely evidence of "diminished capacity")).

Here, Carter would have testified that Garza "could be taken advantage of by somebody who had a high need for control," but he did not opine as to Garza's state of mind at the time of the alleged crime. Accordingly, the proffered testimony did not "directly rebut" the *mens rea* required to convict. *See id.* at 588; *see also* TEX. HEALTH & SAFETY CODE ANN. § 481.121(a) (defining "knowingly or intentionally" as the required *mens rea* for possession of marihuana); *id.* § 481.001(38) (West, Westlaw through 2013 3d C.S.) ("'Possession means actual care, custody, control, or management."); TEX. PENAL CODE ANN. § 6.03(a) (West, Westlaw through 2013 3d C.S.) ("A person acts intentionally . . . with respect to the nature of his conduct . . . when it is his conscious objective or desire to engage in the conduct . . . ."); *id.* § 6.03(b) ("A person acts knowingly . . . with respect to the nature of his conduct . . . when he is aware of the nature of his conduct . . . ."). Moreover, although Garza's defensive theory was that he was unaware that the marihuana was in his trailer, there was no evidence indicating that any person "t[ook] advantage" of him such that he would be unable to form the requisite intent. *See Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010) (holding that the trial court "was not required to admit any expert testimony concerning appellant's mental illness during the guilt stage because it did not directly rebut his culpable *mens rea*" and distinguishing *Ruffin* in part on the basis that "[a]ppellant offered no evidence to suggest that he did not intend to shoot a person").

We conclude that the trial court did not abuse its discretion in excluding this testimony as irrelevant. Garza's third issue is overruled.

####      4.      Imelda Garza

By his fourth issue, Garza contends that the trial court erred by excluding the testimony of his sister, Imelda Garza ("Imelda"), at the guilt-innocence phase of trial. In a proffer of testimony outside the presence of the jury, Imelda stated that she lived with Garza in Zapata, Texas, until he turned eighteen years old. She stated that Garza has often had to borrow money in the past, that he has an inconsistent work history, and that he is susceptible to peer pressure. She stated that, to her knowledge, Garza has never been affiliated with a gang and she agreed that he "does not live an extravagant life." She stated that, every time he had to travel to McLennan County to appear in court, "we would all pitch in for the hotel, the gas, the food." Imelda further stated that Garza's absence at the October 21, 2013 court setting was attributable to the fact that Garza's father inadvertently took Garza's keys and left town. The State objected to Imelda's testimony on relevance grounds. The trial court sustained the objection except as to Imelda's testimony regarding why Garza failed to appear at the court setting. Imelda was then permitted to testify before the jury as to that issue only.[10]

Garza contends on appeal that the remainder of Imelda's testimony was admissible (1) as "character evidence in the form of opinion/reputation establishing that [Garza] is not a trafficker of narcotics and is not known to transport narcotics," and (2) as "an impeachment witness" to rebut the "inference created" by Campbell that Garza's "ability to post a high amount of bond tends to show that he is engaging in illegal activity."[11]

_____

[10] Imelda also testified before the jury that it "would have been extremely easy" for Garza to have crossed into Mexico from their home in Zapata. Further, when defense counsel asked "Is your brother a drug trafficker?", Imelda replied, "No." The trial court sustained the State's objections to this testimony and, pursuant to the State's request, instructed the jury to "disregard the last statement of the witness for any purpose whatsoever."

[11] Garza also asserts that Imelda's testimony was admissible "[t]o rebut evidence of flight elicited"

Generally, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a)(1). However, "[i]n a criminal case, a defendant may offer evidence of the defendant's pertinent trait . . . ." TEX. R. EVID. 404(a)(2)(A). "When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion." TEX. R. EVID. 405(a)(1). "In the guilt stage of a criminal case, a witness may testify to the defendant's character or character trait only if, before the day of the offense, the witness was familiar with the defendant's reputation or the facts or information that form the basis of the witness's opinion." TEX. R. EVID. 405(a)(2).

First, although Imelda opined about her brother's lifestyle, she was not asked during her proffer whether Garza has a reputation for not being a drug trafficker or whether, in her opinion, Garza is not a drug trafficker. Garza did not provide any reputation or opinion testimony; accordingly, her testimony was not admissible as character evidence. *See* TEX. R. EVID. 405(a)(1).[12]

Second, we disagree that Imelda's excluded testimony was admissible to rebut an "inference created" by Campbell. On direct examination, Campbell identified a "Certificate of Failure to Appear" dated October 21, 2013, evidencing that Garza failed to appear in court on that date. The certificate was entered into evidence. Campbell then testified on cross-examination as follows:

---

from Campbell. However, as noted, Imelda was permitted to testify as to the reason Garza failed to appear at the October 21, 2013 setting.

[12] Although the State's only objection to Imelda's testimony was on relevance grounds, we must affirm an evidentiary ruling if it "was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made . . . ." *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).

Q [Defense counsel]    Okay. And we—there's a note on that exhibit about the cost of the bond, which I think was $100,000?

A [Campbell]    Yes, sir.

Q    So when he was originally arrested May 17th, 2012, to get out of jail someone had to post a bond either equivalent to or a portion of ten—of $100,000; is that correct?

A    According to that, yes.

Q    Okay. And you know often bondsmen don't require the whole amount.

A    Yes, sir.

Q    In fact, the purpose of having a bondsman, is the bondsman kind of becomes like a bank. The bondsman stands and says, I'll post the bond. You start making payments to me for whatever percentage of that bond?

A    Yes, sir.

Q    Okay. And you don't know how he made the bond, who paid the bond for him?

A    No, sir.

At trial, in urging the admissibility of Imelda's testimony, defense counsel argued that the State "wanted that [exhibit] in [evidence] because the implication is he's got a lot of money." However, Imelda did not rebut any fact directly testified to by Campbell and she did not state who paid Garza's bond. Moreover, although the prosecutor offered the "Certificate of Failure to Appear" into evidence, he did not query Campbell on direct examination regarding the amount of the bond; instead, defense counsel drew attention to the amount of the bond. And, Campbell agreed with defense counsel that defendants typically do not pay the entire amount of the bond; rather, they make "payments" to the

21

bondsman toward a certain "percentage" of the bond. We therefore disagree that Campbell's testimony gave rise to any inference that Garza has "a lot of money."

Even if Campbell's testimony did give rise to such an inference, and even if Imelda's testimony that Garza frequently had to borrow money and did not lead an "extravagant" lifestyle was admissible to rebut that inference, we find that any error in excluding the testimony would be harmless. The State did not mention the amount of the bond at any point during trial, either in questions or argument; and it never suggested to the jury, either explicitly or implicitly, that Garza must be a drug trafficker because of his wealth. Instead, during closing argument, the prosecutor stated: "We don't believe he's a criminal mastermind. We don't believe he lives in a 10,000 square foot house in L[a]redo. We believe he was the driver and he knew exactly what he was doing." The State's case was based entirely on the facts surrounding the traffic stop, including Garza's furtive demeanor and the fact that the key to the compartment where the marihuana was located was found attached to the key to the truck which Garza was driving. In light of these considerations, we find beyond a reasonable doubt that the exclusion of Imelda's testimony did not contribute to Garza's conviction. *See* TEX. R. APP. P. 44.2(b).[13]

---

[13] The parties do not address which harm standard would apply if we found error in the exclusion of Imelda's testimony. The Texas Court of Criminal Appeals has held:

> The erroneous exclusion of evidence offered under the rules of evidence generally constitutes non-constitutional error and is reviewed under Rule 44.2(b). The exception is when erroneously excluded evidence offered by the criminal defendant "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." Exclusion of evidence might rise to the level of a constitutional violation if: (1) a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to his defense; or (2) a trial court's clearly erroneous ruling results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense. In such a case, Rule 44.2(a), the standard for constitutional errors, would apply.

*Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007) (footnotes omitted). We assume for purposes of this opinion, but do not decide, that any error in excluding Imelda's testimony would be constitutional in nature. *See* TEX. R. APP. P. 44.2(a).

22

Garza's fourth issue is overruled.

### III. Conclusion

Having overruled Garza's issues on appeal, we affirm the trial court's judgment.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
21st day of May, 2015.

23